IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DIRECTV, LLC, <br><br> Plaintiff, <br><br> v. <br><br> OLCR, INC., and TRACY BOGANS, <br><br> Defendants. | CIVIL ACTION <br> NO. 13-3358 |

## MEMORANDUM

**SCHMEHL, J.  /s/ JLS**                                      September 6, 2016

Plaintiff DIRECTV, LLC, filed the complaint in this action on June 17, 2013, alleging a scheme whereby Defendants OLCR, Inc., and Tracy Bogans[1] fraudulently intermediated television service contracts between Plaintiff and numerous government facilities around the country. Defendants were not only unauthorized to act in this role but more importantly manipulated the contracts to charge the facilities one amount, pay Plaintiff a lower amount, and keep the difference.

Defendants initially retained counsel and filed an answer to the complaint, but only a few weeks later the Court granted counsel's motion to withdraw their representation when Defendants proved unable to pay for their services. Other than filing the answer and thus preventing a default judgment, Defendants have not appeared or participated in the case in any way, have not responded to any discovery, and apparently cannot even be located. Specifically, Defendants have not responded to Plaintiff's

---

[1] Defendants are essentially synonymous, OLCR serving only as a business entity for Bogans's activities and Bogans being OLCR's President, CEO, and sole shareholder.

requests for admissions and have filed no opposition to Plaintiff's motion for summary judgment or its supporting statement of facts.

The Court may not simply grant the motion for summary judgment as unopposed. *See* Fed. R. Civ. P. 56; Local Rule of Civil Procedure 7.1(c). But because Defendants have not addressed the facts presented by Plaintiff as required by Rule 56(c), the Court can "consider the fact[s] undisputed for purposes of the motion" and "grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that [Plaintiff] is entitled to it." Fed. R. Civ. P. 56(e). Further, Defendants never responded to discovery, including Plaintiff's requests for admissions, so Defendants are deemed to have admitted all the facts therein. *See* Fed. R. Civ. P. 36(a). In any event, the Court has reviewed the extensive exhibits attached to Plaintiff's motion and is satisfied that the facts set forth by Plaintiff are indeed supported by the record.

Those facts are set forth in detail in both the Memorandum of Law and the Stipulated Statement of Undisputed Material Facts attached to Plaintiff's motion, and as they are undisputed and supported by the record, there is no need to fully recount them here. In brief, the facts are as follows:

Plaintiff sells television services to residential and commercial customers, in the course of which it uses a number of registered trademarks and service marks. Plaintiff sometimes uses intermediary authorized dealers but never had any agreement with Defendants. Nevertheless, Defendants obtained listing as a DIRECTV contractor with the United States General Services Administration. Defendants gained this status using a letter, which may itself have been fraudulent, from one of Plaintiff's actual authorized

dealers rather than from Plaintiff itself; GSA later recognized this letter was insufficient and removed Defendants' GSA standing.

However, Defendants had been able to use their standing as an apparent GSA DIRECTV contractor to set up contracts with dozens of multi-unit government facilities around the country, such as VA hospitals and military bases. In some cases, Defendants simply pretended to be an authorized dealer, but in at least one instance, Bogans set up an account through a legitimate authorized dealer, signing paperwork as though he were an official of the government facility. In the course of acting as a DIRECTV dealer, without authorization, Defendants naturally used Plaintiff's actual marks and similar terms without permission.

For multi-unit facilities such as those involved in this case, where television service is provided to each unit rather than assigned to a particular individual person (hotels are perhaps a clearer example), Plaintiff bills the facilities for the type of service (primarily which channels are included) multiplied by the number of units. Though it is not absolutely specified in the papers, the Court understands that the number of units at a facility can vary without Plaintiff necessarily noticing.[2] Defendants, therefore, were able to misrepresent the number of units at the various facilities. Plaintiff would bill Defendants, as intermediary,[3] for a lower number of units than the facilities actually had; Defendants would in turn bill the facilities for the actual, higher, number of units, obviously at a higher total cost, then pay Plaintiff the lower amount and pocket the difference. Defendants also sometimes simply failed to pay Plaintiffs in turn, or at least

---

[2] This is because the satellite signal comes in to one "headend" unit and then is split and distributed to multiple viewing units without satellite receivers in each viewing unit. *See Sky Cable, LLC v. Coley*, No. 5:11CV00048, 2013 WL 3517337, at *3 (W.D. Va. July 11, 2013).

[3] Of course Plaintiff never authorized Defendants to act as a dealer/intermediary, but Defendants' scheme was such that it was some time before Plaintiff realized what Defendants were doing.

delayed doing so, leading to late fees and service problems for the government facilities. Though the specific numbers will be more relevant in discussing damages below, it is important to note from the outset that this scheme was extensive, involving around two dozen facilities and thousands of total units.

Plaintiff has moved for summary judgment on just Counts I and II of its complaint. Count I is a claim for unauthorized assistance in receipt of satellite programming under 47 U.S.C. § 605(a). That section provides in part: "No person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by radio and use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto." 47 U.S.C. § 605(a). The provision covers satellite television and includes a private right of action. *See DIRECTV Inc. v. Seijas*, 508 F.3d 123, 125 (3d Cir. 2007). The section entails strict liability, and indeed the statute separately provides for increased damages when the violation is willful and decreased damages when the defendant was unaware his or her acts were illegal. *See* 47 U.S.C. § 605(e)(3)(C)(ii) and (iii); *Sky Cable, LLC v. Coley*, No. 5:11CV00048, 2013 WL 3517337, at *20 (W.D. Va. July 11, 2013).

The undisputed facts, deemed admissions, and actual evidence submitted in this case demonstrate without question that Defendants set up accounts and took various actions in order to assist government facilities to receive satellite communications. Some of these actions were fraudulent in and of themselves (such as signing on behalf of government facilities and wrongfully obtaining GSA contractor status). Defendants enabled the facilities to receive services for many units without paying, and in any event Defendants were unauthorized to assist the facilities in this way even for those units for

4

which they actually paid. Defendants' assistance in receipt of communications without entitlement could not be more plain. Further, the Court has no difficulty in concluding that Bogans, who is the sole individual associated with OLCR in any way and who himself took all the actions at issue in this case, is personally liable along with his company. *See Sky Cable, LLC*, 2013 WL 3517337, at *20.

Count II is a claim for unfair competition, false designation of origin, and trade name infringement under Lanham Act § 43(a), which provides:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--
>
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . .
>
> . . .
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1). "[A] plaintiff must demonstrate that (1) it has a valid and legally protectable mark; (2) it owns the mark; and (3) the defendant's use of the mark to identify goods or services causes a likelihood of confusion." *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210 (3d Cir. 2000). As Plaintiff points out, when a defendant uses a plaintiff's exact trademark for the same sort of goods or services, likelihood of confusion is clear. *See S & R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 375 (3d Cir. 1992); *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 195 (3d Cir. 1990).

5

On this claim, too, Plaintiff has indisputably made its case. Plaintiff owns and has registered a service mark for "DIRECTV" and a logo image they call the cyclone design, and never authorized Defendants to use them. In pretending to be a proper intermediary, Defendants did in fact use precisely those marks as well as similar ones including "Direct TV," "DIRECT TV," and "DTV TV." Defendants used the marks and the very similar permutations noted above on physical promotional materials and other communications with the government facilities. Given the exact and nearly-exact marks Defendants used, the GSA-approval as a DIRECTV contractor, and the fact that some government facilities directly contacted Plaintiff about late fees and other issues, there is no question that the government facilities were confused and mistakenly believed Defendants were properly affiliated with Plaintiff and approved to provide services that originated with Plaintiff.

Plaintiff having prevailed on its claims, the Court turns to the relief requested. Plaintiff's proposed order requests a variety of injunctive relief in relation to both claims. Discussion of this relief is almost unnecessary, as Plaintiff is only asking the Court to enjoin Defendants from doing things they have no right to do in the first place, namely: committing further violations of § 605 and § 1125; assisting anyone with receiving or distributing DIRECTV transmissions; using the marks or confusingly similar words and designs; representing themselves as affiliated with Plaintiff; and making misleading statements about Plaintiff being the origin of their services. And Plaintiff has shown:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to

>compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant[s], a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*7-Eleven, Inc. v. Upadhyaya*, 926 F. Supp. 2d 614, 625 (E.D. Pa. 2013). As further discussed below in relation to the measure of money damages, it is essentially impossible to fully uncover and calculate Plaintiff's injury. Defendants' scheme was too wide-ranging for a truly complete investigation, and there are nebulous reputational considerations. Again, Defendants had and have no right to pretend to be an authorized DIRECTV dealer, so the only hardship to them is that they cannot continue to reap the benefits of fraud. Finally, especially given the involvement of numerous government facilities, the public clearly has an interest in preventing further fraud.

As for money damages, on the claim under § 605, Plaintiff has the choice between actual and statutory damages. 47 U.S.C. § 605(e)(3)(C) ("at the election of the aggrieved party"). Plaintiff requests statutory damages, which are calculated based on the number of violations and must range from $1,000 to $10,000 for each violation. *See id.* Plaintiff contends the number of violations in this case is the total number of units for which Defendants sold services, and the Court agrees. In the similar case cited by Plaintiff, the defendants paid for 168 units but actually distributed it to 2,561 units; the court counted each of the 2,393 unpaid units as an individual violation. *See Sky Cable, LLC v. Coley*, No. 5:11CV00048, 2013 WL 5963027, at *6 (W.D. Va. Nov. 7, 2013) (a later opinion in the *Sky Cable* case previously cited). In a sense, this strikes a middle ground between counting the whole scheme (which involved receipt of the signal at a

single "headend") as just one violation and constructing multiple violations to account for the continuous or repeated nature of the transmissions over a long period of time. The court emphasized that it counted the 2,393 extra, unpaid units because those were the ones the defendants were *not authorized* to transmit. In this case, Defendants were not authorized to do *any* of what they did; therefore, the total number of units for which they sold service, all of which they did without authorization, is a reasonable measure of the number of violations.

Plaintiff puts the total number of units, and thus violations, at 6,081. The record supports this calculation, which Plaintiff justifiably describes as a conservative estimate because there are a number of government facilities that were receiving service at both a main location and one or more associated locations, and where the actual number of units at the associated locations was unclear, Plaintiff has counted just one unit for such extra locations. Plaintiff requests an award of $1,000 for each violation, for a total of $6,081,000. This may seem like a high figure, but it actually errs on the side of a lower award in several ways. First and foremost, $1,000 per violation is at the very bottom end of the $1,000 to $10,000 statutory range. *See* 47 U.S.C. § 605(e)(3)(C)(i)(II). Moreover, the Court could easily conclude, if Plaintiff had requested, that Defendants' conduct in this case "was committed willfully and for purposes of direct or indirect commercial advantage or private financial gain," which would increase the per-violation maximum to $100,000. 47 U.S.C. § 605 (e)(3)(C)(ii). Further, as just noted, the actual number of units was surely higher. And as mentioned above, this award does not attempt to over-account for the long periods

of time during which some of these units received unauthorized service. Finally, Plaintiff does not appear to request any separate money damages on the trademark claim.[4] All of these aspects considered, the requested award of $6,081,000 is quite restrained.

For all the reasons stated, the Court will grant summary judgment on Counts I and II and enter Plaintiff's proposed order, which includes judgment in favor of Plaintiff and against Defendants jointly and severally in the amount of $6,081,000, along with various injunctive relief and the opportunity to submit an application for attorneys' fees and costs.[5]

---

[4] Additional relief might be available on the other counts of the complaint, but it is the Court's expectation that Plaintiff will likely dismiss those claims voluntarily after the Court grants summary judgment on counts I and II.

[5] An award of attorneys' fees and costs is mandatory under the statute. *See* 47 U.S.C. § 605 (e)(3)(B)(iii).